```
 1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF MINNESOTA
 2
     ------------------------------------------------------------
 3                                    )
     Jean Alexis,                     )   File No. 21-cv-1882
 4                                    )            (PAM/DTS)
              Plaintiff,              )
 5                                    )
     v.                               )   St. Paul, Minnesota
 6                                    )   November 10, 2021
     Sholom Shaller Family East       )   11:00 a.m.
 7   Campus,                          )
                                      )
 8            Defendant.              )
     ------------------------------------------------------------
 9
                BEFORE THE HONORABLE PAUL A. MAGNUSON
10                UNITED STATES DISTRICT COURT JUDGE
                         (MOTION HEARING)
11
     APPEARANCES
12    For the Plaintiff:        JEAN ALEXIS, PRO SE

13
      For the Defendant:        TAFT, STETTINIUS & HOLLISTER,
14                              LLP
                                ANN HUNTRODS, ESQ.
15                              280 S. 8th St., #2200
                                Minneapolis, Minnesota 55402
16
     Court Reporter:            DEBRA BEAUVAIS, RPR-CRR
17                              300 S. 4th St., #1005
                                Minneapolis, Minnesota 55415
18

19

20
         Proceedings recorded by mechanical stenography;
21   transcript produced by computer.

22

23

24

25
```

**P R O C E E D I N G S**

**IN OPEN COURT**

1  THE LAW CLERK:  All rise.  United States District

2  Court for the District of Minnesota is now in session, the

3  Honorable Paul A. Magnuson presiding.

4  Please be seated.

5  THE COURT:  Good morning, everyone.  We have the

6  matter of Alexis v. Sholom Shaller, the campus.

7  First of all, if you've been vaccinated, feel free

8  to take off your mask.  If you've not been vaccinated, then

9  I would encourage you to wear it until you speak.  At that

10 point, Mr. Alexis, I will encourage you then to use the

11 podium that's by your table there to speak, and at that time

12 I will ask that you do remove your mask.

13 Now, I fully recognize that you're Haitian of

14 background and that I'm really bad in French, so you have to

15 speak English in my courtroom, but that it's language of

16 which you're not as used to as you are with your native

17 language.  As a result of that, when you do speak, we're

18 going to require that you speak slowly and speak loudly

19 because the reporter absolutely must get every word that you

20 say.  And if we don't understand you, we're going to have to

21 go back and ask you to repeat it and so forth.

22 So with those preliminary comments, Ms. Huntrods,

23 do you want to proceed?

1          MS. HUNTRODS:  Thank you.  Good morning, Your

2    Honor.

3          As you know, this is a motion to dismiss the

4    complaint of Mr. Jean Alexis.  My name, of course, is Ann

5    Huntrods.  I am an attorney at the Taft law firm, and we

6    represent the defendant, Sholom Home East, which we noted in

7    a footnote is the correct name of the legal entity that

8    employed Mr. Alexis.

9          THE COURT:  Are you getting used to saying "Taft"

10   yet?

11         MS. HUNTRODS:  I have a hard time saying "Taft" --

12   135 years, not all of which I was at Briggs and Morgan, but

13   a great portion of it.  It is very strange.  It's been two

14   years this January.

15         THE COURT:  Obviously, for me --

16         MS. HUNTRODS:  And my distinguished mentor and

17   colleague was Judge Kyle, and so this particularly has

18   meaning for me here today.  Thank you.

19         THE COURT:  That's right.

20         Okay.  Proceed.  We'll get serious now.

21         MS. HUNTRODS:  The complaint is an alleged

22   discrimination and retaliation claim by Mr. Alexis, who was

23   a former employee of Sholom.  The simple fact is he was

24   terminated because he either refused or failed to get

25   routinely tested for COVID once the Center for Medicare &

1    Medicaid Services required it for all licensed nursing

2    personnel in nursing homes.  This was a mandatory

3    requirement that went into place in September of 2020.

4         The reason we feel this complaint needs to be

5    dismissed is that there are not plausible facts alleged in

6    the complaint itself that would warrant a finding as a

7    matter of law of discrimination.  Instead, the complaint is

8    filled with sweeping conclusory accusations about Sholom's

9    intent but not its actions.  And that's the crux of the

10   matter that we're here about today.

11        I'm going to briefly turn to the discrimination

12   allegation and talk about what few facts there are and why

13   they are deficient.

14        The first adverse and only adverse action in the

15   complaint is the allegation that Mr. Alexis makes that his

16   termination was discriminatory.  And he cites in his

17   complaint two communications he received from Sholom.  One

18   was on September 18th.  It notified all staff of this new

19   obligation that all skilled nursing staff, which Mr. Alexis

20   was one as a licensed CNN [sic], would have to be routinely

21   tested for COVID.

22        If the Court would take judicial notice of the

23   fact that at this time the pandemic in 2020 fall was at its

24   peak.  There were hundreds and hundreds of people who were

25   in nursing homes that were dying.  Every day there were

1    people dying in nursing homes.  That was the reason for this

2    mandate by the CMS.

3          Then the employees were given time to get tested

4    or they could bring in tests, negative tests that had been

5    done in other venues.  And I understand from Mr. Alexis's

6    complaint that he did, in fact, have a second job.  The

7    problem is he never showed up, nor does he argue in his

8    complaint he was ever tested for COVID in that time period.

9    After six weeks passed, Sholom terminated his employment

10    after he had been out on a personal leave of absence because

11    he had not complied with that request.

12          Mr. Alexis has pointed to no other licensed

13    nursing personnel that were given a pass on this mandate,

14    none.  There's no comparable that there is a white employee

15    that didn't have to do it because the facts don't support it

16    and nor did he allege it.

17          He did not claim at the time he received the

18    termination notice that he had been tested.  He did not

19    claim that he had been tested elsewhere.  The first time we

20    ever had any awareness that he is claiming he was routinely

21    tested for COVID is in his response to our brief when we

22    pointed it out.  That is insufficient because it's not in

23    the complaint.  The Court cannot take into account things

24    that are either not in the complaint or incorporated by

25    reference, such as the two letters that I mentioned he

1   himself cited in his complaint.

2          So we then put in another declaration in our reply

3   that showed every one of the instances that Mr. Alexis had

4   been scheduled for a COVID test, and in every one it was

5   cancelled.  There is no factual basis either in the

6   complaint itself, which is the primary issue, or

7   subsequently that he was ever tested, nor did he raise this

8   issue at the time of his termination or now.

9          As we've cited two cases that I think are

10  particularly important in this matter; one is the *Warmington*

11  case, which was Judge Eric Tostrud's case, and the other is

12  the *Soboyede* case, which is Judge Susan Richard Nelson's

13  case.  Both dismissed complaints because they did not plead

14  facts that were sufficient to give rise to an inference of

15  discrimination, and that's where we are today with this

16  case.

17         There are other allegations that Mr. Alexis raises

18  that are the basis for the discrimination complaint, but,

19  again, they don't plausibly suggest -- because, first of

20  all, they're not adverse actions, which is required to have

21  discrimination; and then, secondly, they're not sufficiently

22  severe.

23         Because of the limitations on time, I'll just

24  mention those briefly.  One is that he was put on

25  administrative leave pending investigation of various

1   patients' concerns about him.  And the *Ugrich*, U-G-R-I-C-H,

2   case, which involved a sheriff deputy who was put on a paid

3   administrative leave in that case -- that's also a District

4   of Minnesota case -- the court clearly ruled and the Eighth

5   Circuit has affirmed that when you suffer no adverse action,

6   it can't be discrimination because it doesn't adversely

7   affect.  And in each case of those complaints by the

8   patients at Sholom they were investigated, found not to be

9   conclusively proven, and he was returned.  During the time

10  he was on leave, he was paid.  He suffered no adverse

11  consequences from those.

12          Another item he suggests is evidence of

13  discrimination is that he was given an educational task of

14  going to a communication lesson, basically, on how to

15  communicate effectively with the patients in Sholom.  And

16  that also doesn't rise to an adverse employment action

17  because it didn't result in any pay change, any demotion.

18  It didn't play a role in his termination.  It's never been

19  cited in any disciplinary action, besides the fact he needed

20  to go to this, which it's my understanding he did go.

21          And in the *Yule* case the court made clear --

22  again, another District of Minnesota case -- that it's only

23  actionable if the action leads to a material change in

24  employment status.  Certainly this education class did not

25  do that.

1          Even if those so-called other allegations of facts

2     would be discriminatory somehow, he does not -- excuse me,

3     deemed adverse actions -- not discriminatory, but deemed

4     adverse actions, he does not show that anyone who was not in

5     a protected class was treated differently.

6          The state mandates.  When Sholom receives a

7     complaint of rudeness, alleged abusive behavior by one of

8     the staff, they have a mandatory duty to take action and

9     investigate it, and that's what they did in this case.

10          The only other allegations involve a co-worker

11     named Barbara Hickman, who Mr. Alexis himself acknowledges

12     on page 5 of his reply brief that she was not his

13     supervisor.  She was a co-worker.  He says that he became

14     aware that she told other co-workers that he failed to chart

15     a care of a patient on one occasion.  He doesn't allege in

16     his complaint that she told management and that management

17     did anything in response to that and took disciplinary

18     action against him.

19          The other thing he alleges about Ms. Hickman is

20     that she made a very racially-insensitive comment about --

21     something to the effect of who does this black guy think he

22     is -- clearly not something that Sholom condones -- but he

23     didn't report that to anyone at the time, and he doesn't

24     allege that he did in his complaint.

25          He is claiming Sholom didn't take action to

1    rectify the situation by his co-workers, but he didn't

2    report that particular action.  He did report that she had

3    talked about the charting, but Ms. Hickman herself never

4    reported it and, therefore, there was no action taken based

5    on that.

6            As the Court is well aware, it takes severe and

7    extreme situations to rise to the level of a hostile work

8    environment.  And in the *Warmington* case itself the Court

9    eloquently, in my view, said that the Supreme Court has

10   cautioned courts to be alert for workplace behavior that

11   does not rise to the level of actionable harassment.

12           The standards for a hostile environment are

13   demanding, and conduct must be extreme and not merely rude

14   or unpleasant to affect the terms and conditions of

15   employment.  The courts must filter out complaints attacking

16   the ordinary tribulations of the workplace, such as the

17   sporadic use of abusive language -- in this case,

18   gender-related jokes in the case at hand, in *Warmington* --

19   and occasional teasing.  Inappropriate behavior alone will

20   not be sufficient.  And I think that's what we have in these

21   other examples.

22           I'd like to turn just briefly to the retaliation

23   claim.  I have to confess, to me and my colleague that one

24   is almost incomprehensible to me.  What is the report that

25   would rise to a Title VII practice?  The only report we

1    could decipher was that Mr. Alexis claims that when he sent

2    the email to Ms. Hickman complaining to her about this, in

3    his view, unfounded allegation of not charting for a

4    patient, he copied a supervisor.  That report would not be

5    an opposition to discriminatory conduct.  It didn't mention

6    discrimination.  That report is not sufficient under Title

7    VII.

8          He also alleges that he was falsely reported for

9    misconduct by residents, but that's not him making a report.

10   He opposed those, in his view, false allegations.  But there

11   is, again, no retaliation that's linked.

12          In closing, I would just urge the Court to

13   consider the fact that for any discrimination complaint you

14   have to show that there's an adverse action and that another

15   person who's not a member of the protected class was treated

16   differently.  Mr. Alexis has failed to do it, and we would

17   respectfully ask the Court to dismiss this complaint.

18          Thank you.

19          THE COURT:  Okay.  Thank you, Ms. Huntrods.

20          Mr. Alexis.

21          MS. HUNTRODS:  Did you have a question for me at

22   all?

23          THE COURT:  No.  No.

24          MS. HUNTRODS:  Thank you.

25          THE COURT:  Mr. Alexis.  Please remove your mask.

1           MR. ALEXIS:  Sorry.  What I've been through --

2           THE COURT:  No.  I have to ask you to speak up,

3     too.

4           MR. ALEXIS:  What I've been through is -- was very

5     (unintelligible).  The atrocity, like, leave me destitute.

6     No one never choose where to be born.  No one never choose

7     what color you're going to be.  Maybe now if I would be

8     choosing, I will go with the one which look like everybody

9     kind of accept.  And that's one of the reason I might be

10    very happy in the front of this Court, because I know also

11    in the world of some people, if I can say like this, I

12    wouldn't be able to stand even one second if it wasn't for

13    the court, because I know it's impossible.

14          We all have an impact where we working, and that

15    was the first thing I said in my complaint and even in the

16    opposition of -- the opposition of -- the opposition to the

17    -- to the motion to dismiss.

18          THE COURT:  I'm sorry, would you repeat that.  I

19    did not get it.

20          MR. ALEXIS:  I said no one never choose where to

21    be born.  No one ever choose.  And you don't have that

22    choice to choose your color.

23          It was very like -- we all have a name tag and we

24    all know each other.  And if I did something, if and when,

25    it was bad, but it wasn't and I didn't do anything wrong.

1    But talking about me in the morning when I finish to write

2    that email, the first email I sent to Barbara Hickman, and

3    then I copied the messenger, two nurses, and I copied my

4    supervisor at that time.

5              Calling me a black guy -- yes, I know where I come

6    from.  We don't have that structure here.  Of course -- and

7    maybe now it's worse -- I come from Haiti.  And I would also

8    thought because I didn't choose anything I don't ask anybody

9    to discriminating.  That doesn't get into the job I'm doing

10   or my intelligence here.

11             Once she said that and then I went to the --

12   nobody answer.  Nobody answered that email that I sent to

13   Barbara herself and my supervisor.  No one that's in Sholom

14   or the defendant never answered.

15             While I'm leaving in the morning, she came to the

16   office --

17             THE COURT:  Mr. Alexis, what difference does it

18   make if they answered or did not answer?

19             MR. ALEXIS:  Because they don't take in

20   consideration my complaint of discrimination.

21             We all have an impact.  You call me a black guy.

22   Or I'm making Sholom lose money because I don't check, which

23   was a lie and I showed it.  And she even acknowledged it.

24   And then after that so many adverse actions.

25             And Sholom is very toxic place to work, and

1    everybody knows it.  All employees knows it.  Me, I don't

2    talk too much, but when they're talking, I get it.

3            Every time when I was up late I had to work on the

4    floor.  Every time they change me the floor.  I never

5    complain because myself, I really like try to be

6    professional in everything that I'm doing.  Whether I am a

7    CNA, an accountant, everything I'm doing, no matter how I'm

8    doing, I try to do it good.

9            And then later on they keep make me, like, going

10   floor to floor.  I didn't think it was -- I was naive a

11   little bit to understand at the beginning.  And then after

12   that I have complaint for everything, everything.

13           I work only two days.  And then when I follow the

14   pattern and the actions and then I try to connect, I start

15   to connect the dots.  For example, they move me to a floor I

16   didn't work.

17           THE COURT:  I'm sorry, after you connected dots,

18   then what did you say?

19           MR. ALEXIS:  For example --

20           THE COURT:  Right.

21           MR. ALEXIS:  -- they move me to a floor.  And then

22   when I go to work but luckily the nurse at that night move

23   me to another one.  In the morning (inaudible) called me:

24   Jean, we have to investigate because you work with the COVID

25   people.  I said, Really?  Okay.  Then she start and then I

1    said, I didn't work that floor.  She said, Oh, I'm sorry.

2    She hung up.  And then I start to understand.

3          And then they make it very difficult for me.

4    Every time I come, I'm kind of like shaking anxiety.  For

5    example, if I work night shift, when I go to sleep, I am

6    kind of waiting until something happened.

7          I never have a problem for testing.  Even right

8    now I test every Monday, every Monday.  At that time I had

9    two jobs.  I said even in my opposition to the motion, I

10   always -- it's never been a testing.

11         And I even prove, like, for example, the nurse

12   take me off the schedule without notice.  No management will

13   do that.  I went to work, and then I arrived she said, Jean,

14   you cannot work.  I said, What happened?  She said, Oh, you

15   cannot work.  I said, What happened?  You cannot just take

16   me off the schedule and then you tell me I cannot work.  I

17   said, Okay, give me a paper.  Give me anything.  She sign a

18   paper.  And it's in my exhibit.  I forget what number it

19   was.  And then the nurse tell me, Okay, you cannot come back

20   to work until you completed call.  The administration --

21         THE COURT:  I'm sorry, you can't come back to work

22   until when?

23         MR. ALEXIS:  Until I call that administrator.

24         THE COURT:  Okay.

25         MR. ALEXIS:  Then I said just for that -- she

1    said, You have to call the big boss.  I said, Ah.  Then I

2    might really do something wrong that time because now it's

3    the big boss.

4        I went.  I keep calling her.  I left messages.

5    Nobody never call me back.  I call (unintelligible) and

6    nobody ever call me back.  Before I would call

7    (unintelligible) she would call me back or leave me any kind

8    of messages.

9        Then I receive a letter from (unintelligible).

10   I'm not working for (unintelligible).  And it was a copy.

11   It was a copy.  All the letters I receive always in color

12   and with a signature.

13       I know maybe I don't know management well, but I

14   think even in Haiti where I come from and where the

15   defendant, like, said I don't have those things, I know

16   management, how it works.  So all the letters always like

17   this (indicating).  The one I receive is like that

18   (indicating) -- no signature, nothing, nothing.  And it does

19   come from the branch that I'm working for.  So I was like

20   what is that?

21       And then I keep calling still to ask question

22   about it or find a way to solve the problem because me, I'm

23   living at that time and living in America alone doing

24   everything -- my apartment, my car, my everything.  So I was

25   really, like, eager to solve it so I can be okay with my --

1   I was kind of like stressed.  And I'm at school.  And then

2   no one never called me.

3           When I receive a letter telling me about COVID and

4   then they credited my account for some 20 dollars 72 I was

5   like -- for back COVID pay, then I understand.  That's when

6   I -- because I couldn't find them, I write them another

7   letter -- email.  I have the receipt, and I have the email.

8   I sent it two ways:  the mail -- I pay UPS to even mail it

9   for me, and I email it and I copy Karissa Pope.

10          I told them, okay, now -- I go straight to the

11  point telling them that, okay, that's discrimination,

12  coercion, coercion, everything like to explain to them I

13  understand what they are doing.  And then they never

14  answered me because me, I want to solve it because, like, my

15  life was in jeopardy.  I'm at school.  I couldn't do

16  anything.

17          I even go to Haiti because I have no one in

18  Minnesota.  I live alone.  That's also when I understand

19  they asking me some simple question to collect information.

20  They really wanted to hurt me because they ask me that.  I

21  said, Yeah, I'm living alone.  I cannot work with COVID

22  people at the beginning because we didn't know anything

23  about it at that time.  Everybody was killed.  And then me,

24  logically I said I want to avoid cross contamination because

25  I had two part-time jobs to pay my bills, my apartment

1    mostly.

2         Then I receive a letter that they tell me that

3    they didn't and then I was, like, okay.  I couldn't do

4    anything.  I dropped -- at that time, I finished to graduate

5    in St. Paul.  I was about to start in (unintelligible).  I

6    drop everything, and I had nobody to help me to figure those

7    things out.  I'm scared of eviction because I don't want to

8    be able to rent an apartment another time.  I have no one

9    here.  Nobody here, nobody to ask.  And I don't steal the

10   government stuff.  I like to work.

11        So at that time I went to Haiti asking for some

12   money.  Some friends help me and then I came back.  So when

13   I came back in October, I found the letter like I'm

14   terminated, so I moved.  It was about to be cold in October.

15   I slept in my car becoming homeless, and I'm serious.

16        THE COURT:  I'm sorry, you did what?  What did you

17   just say?

18        MR. ALEXIS:  I said I sleep in my car because I

19   was homeless.  And I'm still homeless, even when I don't let

20   life define me.  So I always try to be professional or try

21   my best to be presentable.

22        So telling me that it wasn't discrimination when

23   your supervisor -- you said -- I never said she's my

24   co-worker.  Yes, she is co-worker, but she was the

25   supervisor.  And then that's the proof of -- she use -- she

1    use the -- the -- that they don't -- she knows my name.  Why

2    she didn't say Jean?

3              And then she said I come from Haiti.  Do I have

4    those things?  Yes.  That doesn't define who I am.  And I

5    cannot -- my intelligence to do the job and it's

6    discrimination because you don't use those things in the

7    workplace.

8              And adverse action, I live it every day I went to

9    work.  I work only two days, two days.  I -- Wednesday -- I

10   never work Wednesday.  They report me.  That resident say

11   that I did something on Wednesday.  I tell my supervisor.

12   She was, like, perplexed.  She say, Ha.  But I tell them

13   that.  They didn't do nothing.

14             So I have been punished for something that I

15   didn't do.  I didn't work on Wednesday.  And then they put

16   -- that's when they sent me to a class for communication.

17             And then I never say resident before.  A resident

18   come like for admission, they are assessment --

19             THE COURT:  Excuse me, I have to interrupt.  They

20   sent you to this class on communication.  How is that in any

21   way, shape or form an adverse employment action?

22             MR. ALEXIS:  No, I -- I -- it's not the class

23   itself.  It's the sequences of the actions, like, they keep

24   doing.  For example, to that class I went because on

25   Wednesday I wasn't even working.  Somebody said a

1   resident -- they always said the resident said.  Me, I know

2   resident and their chart.  They have right to refuse, right

3   to be happy, right to be not neglected.  And, like I said, I

4   give it again in my exhibit, if I was abusing -- if I abuse

5   somebody, I wouldn't be able to work as a CNA.  So how come

6   you -- they sent me to a class.  I went to that class.  They

7   say it's communication.  But later on they say no, it wasn't

8   communication, it's me cursing.  Sometimes residents -- like

9   me, I've been abused by a resident.  I never say a word,

10  never said a word, because naturally I'm not like that.

11          Second, I can speak English, but sometimes when it

12  goes fast, I don't even understand, I don't respond.  So I

13  just keep it so I don't make them angry or I might say

14  something they interpret it in another way.  I never say

15  nothing, but they punish me for that.  They send me to a

16  class saying that I am -- like I abuse the resident, that I

17  tell them to shut up.  I never say nothing.  And I have

18  witnesses.  They know.  They know everything.

19          So -- and the difference that I am black is a

20  protected class.  And I stand because of bullies, because of

21  coercion and intimidation, because of discrimination.  Since

22  that time all those actions come against me.  Sometimes I

23  don't even say nothing, but problems come anyway.

24          THE COURT:  Mr. Alexis, I think we're starting to

25  get into a repetitious thing.  I understand you want to tell

1    your story, but we just can't repeat it over and over.

2         MR. ALEXIS:  It's, like I said, because of my

3    literacy I might not be able to explain it with the law as I

4    did by researching on my motion to dismiss -- in my

5    opposition to the motion to dismiss, Your Honor.

6         But all I'm saying, the defendant always go and

7    misinterpret it, turn it, for example, to COVID-19 testing.

8    Like I said, every Monday I'm testing.  Nobody ever ask me

9    that.  No one never asked me that.  They stopped doing all

10   those things since she take me out of schedule without

11   notice.  That's an adverse action.  You don't take out an

12   employee without notice.  I give you that in the exhibit.

13        The nurse give me -- she said call the

14   administrator.  As a CNA, I know it's going to be difficult

15   for me to call the administrator and to fight her.  When I

16   tried my best -- I even offered to resign because there was

17   a time they accuse me of assault.  I never do anything to

18   anybody.  I never assault anyone.  And then the defendant

19   said I assault a resident.

20        I stay nine days for investigation.  Those nine

21   days was in September, and then I couldn't pay my rent

22   because they hold the pay.  And I even sent again -- Mike

23   sent me messages saying you fix, but it wasn't all those

24   things.  It cause me problem, a lot of adverse action.

25        Like I said, I give so many exhibits to explain in

1    words what I said because I know I'm not the lawyer and,

2    like I said, because I am illiterate concerning the law, but

3    I can research and know logically to present what they did

4    to me.  But it was discrimination on all the way.

5          After they take me off the schedule, there is a

6    woman call me, even though I never know her.  All I know,

7    because I have Caller ID, her name.  She was, like, calling

8    me intimidating me.  What is that?  And I don't even know

9    her.  Her name is Galleway, Madeline Galleway.  Again, I

10   give it in an exhibit.

11         It was never -- never been a COVID-19 testing.

12   And my --

13         THE COURT:  You know, I'm sorry, you say it has

14   never been COVID testing.

15         MR. ALEXIS:  No.

16         THE COURT:  Respectfully, Mr. Alexis, everybody in

17   this room has had friends that have passed as a result of

18   COVID-19, and huge numbers of them are in nursing homes.  As

19   a result of that, the state issued mandates about testing.

20   That was a mandate for anybody in any nursing home anywhere

21   in the State of Minnesota that they had to be tested.  It's

22   a period.  And the employer is entitled to know that that

23   employee has been tested by a showing of the testing.

24         That is a reality, and that is the rule that

25   exists with respect to the COVID testing as of September

1    2020.  It's different today.  It was different in March of

2    2020.  But in September that's what it was.

3                  MR. ALEXIS:  Can I, Your Honor?

4                  THE COURT:  Well, of course you are.

5                  MR. ALEXIS:  When I say it's never been COVID-19

6    testing, it's not like I'm saying I didn't test.  I test.

7    Even -- like I said, even now I test every Monday because I

8    have two jobs.

9                  THE COURT:  That may be going on today, but I'm

10   telling you at the time that this action occurred, the

11   employer is entitled to know because the truth of the matter

12   is --

13                 MR. ALEXIS:  Your Honor --

14                 THE COURT:  No, I want you to listen to this

15   because this is important.

16                 At the time that this arose, there was a great

17   deal that was not understood about the COVID.  But the one

18   thing that was known is that old people like myself,

19   overweight people like myself were very, very susceptible

20   not only to the illness of it but to death.  Now, the

21   reality is people of this nature are people that are in

22   nursing homes.

23                 How are people in nursing homes getting the COVID?

24   It was being brought in by employees or it may have been

25   brought in by visitors if they were, unfortunately,

1     permitted.  That is a reality that that employer had to live

2     with.

3            And, you know, you can have -- I understand the

4     other things you're talking about.  I understand the factors

5     that are involved in what you feel was inappropriate

6     employment action.  I understand that.  But I do not accept

7     that this employer has any exception to the rules that were

8     passed down to the nursing homes by the State of Minnesota.

9     That's the way it is.  I'm sorry, but that's the way it is.

10           MR. ALEXIS:  Your Honor, I did testing.  That's

11    what I said.  It was --

12           THE COURT:  I can't hear you, and I can't

13    understand you.

14           MR. ALEXIS:  I did test, and then I tested because

15    I had two jobs.

16           THE COURT:  Yes, you got tested.  You got tested,

17    but the employer did not know that you were tested.  And

18    it's the employer that has to know it.

19           MR. ALEXIS:  They never ask me.

20           THE COURT:  They don't have to ask you.  You have

21    to show it.

22           MR. ALEXIS:  Your Honor, I've never been asking --

23    what they said -- they say they ask me.  I didn't do.  I

24    fail.  I didn't.  They just took me off the schedule.  And

25    then after that I was, like, moving and in trouble, but I

1    never -- it wasn't that.  Everything I'm saying I tested,

2    and that's what I said even now.  I'm still testing.  It's

3    not about COVID at all because I tested.

4            I worked.  So they wouldn't just take me off the

5    schedule.  I worked for them.  I did everything.  I even

6    give that -- the first one every time they have COVID-19

7    classes, I'm the first one to be there because I finish at

8    6:30 and then the class always start at 7:00.  I'm always

9    there.  All questions -- I'm always participating.  I'm not

10   like somebody who's going against law.

11           I'm strict with myself first because I'm new to

12   that system.  I don't want to make mistake.  I try to be

13   professional.  Like I said, I tested.  They took me -- they

14   disguise it in a way we can get away with the discrimination

15   because it's come later, after.  It came after, when they

16   take me off the schedule, not even before they take me off

17   the schedule.  So they take me off the schedule, and then

18   now they start creating all the adverse action, even when

19   I'm not working.  I tested.

20           And, like I said, I might not be able to cite the

21   law, but I'm black and I -- I -- they let me know that.

22   It's not like I didn't know before.  But now the way they

23   were treating me then they let me know really you are black.

24   It's a protected class by law and adverse action.

25           So it doesn't have to be like -- something like

1    making me, like, losing money only, but it can be just like

2    denoting me where I come from.  Everybody knows I am from

3    Haiti now.

4            All those things get into the way of saying

5    everything that I present as fact in the -- in the complaint

6    itself.  And my opposition to the motion to dismiss get into

7    code word with the law by everything I was saying because

8    they really make me suffer.  I really suffered.  And I lost

9    a lot.

10           I don't think --

11           THE COURT:  I don't question that, but you're

12   getting to the point of what you would be saying at a

13   trial --

14           MR. ALEXIS:  Okay.

15           THE COURT:  -- not what we're saying with respect

16   to a motion to dismiss under Rule 12(b) and the rules of

17   procedure that are applicable to that.  That's the

18   restriction to where we are in this case at this time.  I'm

19   not saying at a later time you won't tell your full story.

20           MR. ALEXIS:  I can give you an example for -- in

21   February 26, 27 -- two days -- I work on 26 --

22           THE COURT:  February 26, 27 what year?

23           MR. ALEXIS:  2020.

24           THE COURT:  2020, okay.

25           MR. ALEXIS:  Two days -- March 3rd, March 17, 19,

1    25 of 2020 I get reported.  April 27, 28 I get reported.

2    May 5th, May 8 I get reported.  Like I said, the reality of

3    the way those things happened, me, I never complained and I

4    always said okay, I know I'm not guilty, and I know I won't

5    do those things.  Go for the investigation.  They always

6    come back, okay.  We find that's okay.

7            And I know, for example, the resident who curse at

8    me, really curse at me -- some words, I know them.  I don't

9    say a word.  The same reason that -- the same thing they did

10   to nurses because before you take a resident, there is an

11   assessment to know if they have allergy, if they want to be

12   resuscitated if they have a heart attack.  If they have any

13   problem, you will know.  That's if they have a behavior, we

14   know.

15           So when the resident say something, for me they

16   put me in investigation.  They curse at others, no one ever

17   do anything.  How do I know?  Other employee told me because

18   everybody knows.  Everybody talk.  Because I work only two

19   days it's very rare and difficult for me to find out.  And

20   me, I don't really have a lot of friends because I keep

21   going to my work and go home.

22           But (unintelligible) of the sequences of the

23   reports and it makes me -- my reputation -- even when I was

24   right, it is wrong because it keeps repeating.

25           Example:  The defendant say that I am rude and

1   abusive.  It's never been.  Like I said, if I was abusive,

2   the Department of Health would revoke my certificate.  I was

3   never abusive to anybody, even to myself.  Even in hardship

4   I'm not that person.

5            And then I know they were doing the same thing to

6   a Kenyan and a Cameroonian.  And how do I know --

7            THE COURT:  I'm sorry, they were doing the same

8   thing to who?

9            MR. ALEXIS:  Same thing to a Kenyan and a

10  Cameroonian.

11           THE COURT:  Repeat that again.

12           MR. ALEXIS:  They were doing the same thing to a

13  Kenyan and Cameroonian.

14           THE COURT:  Okay.  Are those people named in the

15  complaint?

16           MR. ALEXIS:  I didn't do their name and then --

17  but I'm --

18           THE COURT:  Thank you.  That's fine.  That's just

19  what I wanted to know.

20           MR. ALEXIS:  It's in the complaint, but I don't

21  know their name.  An employee told me.

22           So -- and then that's when -- when I see like

23  this, I offered -- I offered to resign.  When she said,

24  Okay, we are going to give you a paper to sign I said, Okay,

25  I'm not going to sign it.  Let me resign.  I don't like to

1    fight.  She said, No, don't resign.  It's just educational

2    stuff.  I said, No, it's not educational you put there.  And

3    then she change it educational.  That's when I go to the

4    class.

5           Again, I wasn't working.  If that is not an

6    adverse action, I don't know how to explain it any more.

7           Your Honor --

8           THE COURT:  I hate to interrupt you, but, first of

9    all, there was a 20-minute time limit.  We've gone well over

10   it.  I think we're being repetitious of your whole story.  I

11   understand the story.  I understand the egregiousness that

12   you feel.  And I also understand the case that is pending

13   before us at this time.

14          So I think we should just conclude your argument,

15   unless you have another minute or so that you want to tell

16   me something else.

17          MR. ALEXIS:  Your Honor, I would finish with the

18   same thing I start with.  No one ever choose where to be

19   born.  And then helping somebody who is -- that was

20   literally like soiling in her bowel movement and then I said

21   -- the nurse said, Leave, leave her -- leave him.  I said,

22   No.  If it was my father, I would do the same.  Then I took

23   that person to clean that person with all -- sorry my

24   language -- with all the poop and that person cursing at

25   you, and then that's you again having a problem just because

1    you're trying to do your job well.

2              THE COURT:  Okay.  Thank you.  Thank you.

3              Anything further, Ms. Huntrods?

4              MS. HUNTRODS:  No, Your Honor.  We'll stand on our

5    briefs.

6              THE COURT:  Okay.  Very well.  We will take the

7    matter under advisement.  We'll let you know just as soon as

8    we can.  Thank you.

9              (Court adjourned at 11:45 a.m.)

10                        *      *      *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          I, Debra Beauvais, certify that the foregoing is a

2     correct transcript from the record of proceedings in the

3     above-entitled matter.

4                    Certified by:   *s/Debra Beauvais*
                                     Debra Beauvais, RPR-CRR
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25